**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA and
the STATE OF FLORIDA,
ex rel. TODD GOBERVILLE,
SIMON CASORIA, and
RICHARD J. WALLACE, III,

CASE NO. 0:23-cv-61318-DMM

JURY TRIAL DEMANDED

Plaintiffs-Relators,

v.

DEPUY SYNTHES, INC., a Foreign Corporation;
DEPUY SYNTHES SALES, INC., a Foreign Corporation;
TENET HEALTHCARE CORPORATION, a Foreign Corporation;
DELRAY MEDICAL CENTER, INC.
d/b/a DELRAY MEDICAL CENTER, a Florida Corporation; and
WEST BOCA MEDICAL CENTER, INC.
d/b/a WEST BOCA MEDICAL CENTER, a Florida Corporation,

Defendants.
_______________________________________/

**SECOND AMENDED COMPLAINT**

Plaintiffs-Relators, TODD GOBERVILLE, SIMON CASORIA, and RICHARD J. WALLACE, III (collectively, the **"Relators"**), by and through undersigned counsel, hereby file this Second Amended Complaint on behalf of the UNITED STATES OF AMERICA and the STATE OF FLORIDA against Defendants, DEPUY SYNTHES, INC.; DEPUY SYNTHES SALES, INC. (together, **"Synthes"**); TENET HEALTHCARE CORPORATION (**"Tenet"**); DELRAY MEDICAL CENTER, INC. d/b/a DELRAY MEDICAL CENTER (**"Delray Medical"**); and WEST BOCA MEDICAL CENTER, INC. d/b/a WEST BOCA MEDICAL CENTER (**"West Boca Medical"**) (collectively, the **"Defendants"**), and in support state as follows:

## I. PRELIMINARY STATEMENT

1. This is a qui tam action brought on behalf of the United States of America and the State of Florida by Relators Todd Goberville, Simon Casoria, and Richard J. Wallace, III — three orthopedic-industry insiders with decades of firsthand experience inside the trauma-implant ecosystem at Defendant Tenet Healthcare Corporation's South Florida hospitals — to recover monies wrongfully paid by Medicare, Medicare Advantage organizations, the Florida Medicaid Program, TRICARE, and other federal and state healthcare programs as the direct and foreseeable result of a longstanding, deliberate, and systemic kickback scheme operated collectively by Defendants at Delray Medical Center and West Boca Medical Center and concealed from the United States and the State of Florida for nearly a decade.

2. Beginning no later than 2015, and continuing through the present, Defendants entered into a web of inter-related financial arrangements that functionally operated as illegal kickbacks paid in exchange for the referral, purchase, and use of Synthes orthopedic implants in trauma and reconstructive surgeries performed on Medicare, Medicaid, and TRICARE beneficiaries. The unlawful remuneration took multiple forms, all of which were knowingly structured to evade and circumvent the prohibitions of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, which forms included at least the following: (a) substantial annual "rebates" paid by Synthes to Tenet and its subsidiary hospitals conditioned upon achievement of a contractual market-share threshold of eighty percent (80%) of the orthopedic implant procedures performed at those hospitals, whether expressed as a single threshold or as tiers of increasing rebate culminating at that threshold (the "80-20 Rule"); (b) the provision of free physician assistant services to surgeons who agreed to use Synthes products in their cases; (c) cash bonuses paid by Tenet to hospital executives, operating-room directors, and supply-chain personnel tethered to

enforcement of the 80-20 Rule and the reduction or elimination of competing implant suppliers; and (d) the systematic, coordinated exclusion of competing implant systems from Defendants' facilities to ensure the rebate threshold was met, despite the expressed preference of healthcare providers for competing implants based on the judgment of those providers that such implants were clinically superior.

3. Relators observed, documented, and were themselves excluded by Defendants' conduct at Delray Medical and West Boca Medical (together, the "Subject Hospitals"), where the 80-20 Rule was administered by Tenet corporate personnel and enforced by the Subject Hospitals' senior administrators, including their Chief Financial Officer, Chief Nursing Officer, Director of the Operating Room, Administrative Director of Surgical Services, and Director of Supply Chain, each of whom is identified by name below. This Second Amended Complaint seeks recovery for the false claims that the 80-20 Rule caused the Subject Hospitals to submit to Medicare, to Medicare Advantage organizations, to the Florida Medicaid Program and its managed care plans, and to TRICARE from January 1, 2015, through the present.

4. Compliance with the Anti-Kickback Statute is, by both statute and provider contract, a precondition to participation in and a condition of payment by Medicare, Medicaid, and TRICARE. The Anti-Kickback Statute was amended in 2010, effective March 23, 2010, to expressly provide that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). Every Medicare, Medicaid, and TRICARE claim submitted by the Subject Hospitals for any orthopedic device or related procedure performed in furtherance of the 80-20 Rule is therefore a false claim under 31 U.S.C. § 3729 and the Florida False Claims Act, Fla. Stat. §§ 68.081–68.092.

5. The false claims are not hypothetical, and their submission and payment are not simply inferred from the apparent age of the patients Relators saw in the operating room. As set forth in Section IX.I below, Relators have analyzed the hospital discharge records that the Subject Hospitals themselves reported to the Florida Agency for Health Care Administration ("AHCA") and the Medicare fee-for-service claims that the Subject Hospitals submitted to, and were paid by, the Centers for Medicare & Medicaid Services ("CMS"). Those government records establish that, from January 1, 2015 through December 31, 2024, the Subject Hospitals submitted and Medicare paid 3,320 fee-for-service inpatient claims for admissions in which an internal fixation device of the kind supplied by Synthes was implanted, on which Medicare paid $42,036,779.45; that the Subject Hospitals reported an additional 2,092 such admissions billed to Medicare Advantage organizations through June 30, 2025; and that the Subject Hospitals reported a further 434 such admissions billed to the Florida Medicaid Program and its managed care plans over the same period. The 80-20 Rule required that Synthes implants be used in at least eighty percent (80%) of the orthopedic implant procedures at the Subject Hospitals, the Subject Hospitals enforced that requirement by removing competing implant systems from their operating rooms and overriding their surgeons' implant selections, and each claim for an admission in which a Synthes implant was used is a false claim within the meaning of 42 U.S.C. § 1320a-7b(g).

6. Defendants have asserted and continue to assert that their year-end rebate payments are protected by the so-called "Discount Safe Harbor" to the Anti-Kickback Statute, codified at 42 U.S.C. § 1320a-7b(b)(3)(A) and implemented by regulation at 42 C.F.R. § 1001.952(h). That assertion is wrong. As set forth in detail in Section VI below, the Discount Safe Harbor protects only narrowly defined, properly disclosed, and properly reported price reductions on the specific good or service purchased. It does not, and cannot, protect remuneration that rewards a hospital

for the share of its surgical procedures in which a vendor's product is used rather than reducing the price of a specific item purchased, that is tied to the exclusion of competitors, that is intended and implemented to override the conflicting clinical judgment of healthcare providers who sought to use competing products, that is paired with in-kind benefits flowing to referral sources (such as free physician assistant services to surgeons), that is paired with executive bonuses paid to influence purchasing decisions, or that has, as even one of its purposes, the inducement of referrals of federally reimbursable items or services. Defendants' arrangement is none of those things. It is a referral-inducement scheme dressed in the costume of a protected discount.

7. Relators bring this action under the qui tam provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq. (the "Federal FCA"), and the Florida False Claims Act, Fla. Stat. §§ 68.081–68.092 (the "Florida FCA"). Relators seek treble damages, statutory civil penalties of $14,308 to $28,619 per false claim (as adjusted for inflation), their statutory share under 31 U.S.C. § 3730(d) and Fla. Stat. § 68.085, attorneys' fees, costs, and all such further and equitable relief (including injunctive relief) to which they are entitled.

## II. PARTIES

### A. Plaintiffs-Relators

8. Plaintiff-Relator Todd Goberville ("Goberville") is an individual with a principal place of residence in Florida. He brings this qui tam action as a "relator" on behalf of the United States and the State of Florida. Goberville is the President of Goberville Orthopedic Consulting, Inc., a Florida for-profit corporation that provides sales and consulting services to suppliers of orthopedic implants. Goberville has worked in the orthopedic implant industry for more than seventeen (17) years. He began his career at Stryker Corporation ("Stryker"), where he worked for

approximately twelve (12) years, and has consulted for Trident, CarboFix, and other orthopedic implant manufacturers. Goberville has direct, firsthand, and contemporaneous knowledge of specified facts alleged in this Complaint, having been competitively disadvantaged by Defendants' enforcement of the 80-20 Rule for years.

9. Plaintiff-Relator Simon Casoria ("Casoria") is an individual with a principal place of residence in Florida. He brings this qui tam action as a "relator" on behalf of the United States and the State of Florida. Casoria is the President of Trident Orthopedics, Inc. ("Trident"), a Florida for-profit corporation that manufactures and sells orthopedic implants. Casoria has over twenty-five years of experience in the orthopedic industry. Trident's Modular Foot-Osteosynthesis System offers a wide selection of plates, screws, and all required instrumentation for common indications in trauma and reconstructive orthopedic surgery. Casoria has direct, firsthand knowledge of specified conduct alleged in this Complaint. Casoria served the United States with distinction as a member of the United States Navy SEALs.

10. Plaintiff-Relator Richard J. Wallace, III ("Wallace") is an individual with a principal place of residence in Florida. He brings this qui tam action as a "relator" on behalf of the United States and the State of Florida. Wallace is the Vice-President of Trident and supervises sales in the State of Florida. Wallace has over fourteen years in the orthopedic industry. Wallace has direct, firsthand knowledge of specified conduct alleged in this Complaint. Wallace served the United States with distinction as a member of the United States Navy SEALs.

11. Relators have direct, firsthand, contemporaneous, and on-the-ground knowledge of specified operative facts and of the resulting submission of false claims to Medicare and other Federal healthcare programs. Relators, in their consulting capacity, personally entered the operating rooms at Delray Medical and West Boca Medical on numerous occasions to deliver and

exchange trauma implants and instrumentation for trauma and reconstructive surgical procedures. Relators personally observed and participated in the implant-selection and tray-management process for hundreds of orthopedic surgical procedures at the Subject Hospitals from 2015 through 2023. Relators observed the identities of the operating surgeons, the patients' demographic characteristics (including age categories indicating Medicare eligibility), the specific implants sought to be utilized and those actually used in specific procedures, the circumstances under which surgeons' preferences were overridden by enforcement of the 80-20 Rule, and the surgical disposition. Relators further have personal knowledge that Delray Medical and West Boca Medical bill Medicare, Medicaid, and TRICARE for orthopedic trauma procedures performed on beneficiaries of those programs in the ordinary course of their hospital operations, as is the universal industry practice of acute-care hospitals with operating Level I trauma centers and emergency departments serving the general population. Through their careers and ongoing consulting work, Relators are intimately familiar with how implant procedures are coded and billed by hospitals to Federal healthcare programs, including the use of the DRG payment methodology for inpatient stays, the use of Form UB-04 (CMS-1450) and its electronic equivalent (the ASC X12N 837I institutional claim) for hospital inpatient and outpatient claims, and the bundling of implant cost and surgical-procedure cost into reimbursement claims submitted to CMS. Relators have further confirmed, through the government claims data described in Section IX.I below, that the Subject Hospitals in fact submitted, and Medicare, Medicare Advantage organizations, and the Florida Medicaid Program in fact paid, thousands of claims for the very category of procedures Relators observed. Relators' personal knowledge of (i) the kickback arrangement, (ii) the patient procedures in which the kickback-tainted implants were used, and (iii) the manner in which those procedures are billed to Federal healthcare programs, together with the government claims data

confirming the submission and payment of those claims, establishes that false claims were in fact submitted to the Government as a direct and foreseeable result of Defendants' kickback scheme.

**B. Defendants**

12. Defendant DePuy Synthes, Inc. ("DePuy Synthes") is a Delaware corporation with its principal place of business in Warsaw, Indiana. DePuy Synthes is a manufacturer of medical devices and supplies and is the world's largest manufacturer of implants used to repair bone fractures. DePuy Synthes also produces surgical power tools and advanced biomaterials. DePuy Synthes regularly sells its products in the State of Florida and maintains full-time employees within the State. DePuy Synthes is an indirect wholly owned subsidiary of Johnson & Johnson.

13. Defendant DePuy Synthes Sales, Inc. ("DePuy Synthes Sales,") is a Massachusetts for-profit corporation with its principal place of business in Raynham, Massachusetts. DePuy Synthes Sales is a medical-supply company that regularly distributes, markets, and sells products in the State of Florida and maintains full-time employees within the State. DePuy Synthes Sales is registered to do business as a foreign entity in the State of Florida.

14. Defendant Tenet Healthcare Corporation ("Tenet") is a Nevada for-profit corporation that operates as a multinational healthcare services company, with its principal place of business in Dallas, Texas. Through its brands, subsidiaries, joint ventures, and partnerships — including United Surgical Partners International (USPI) — Tenet operates approximately sixty-five (65) acute-care hospitals and more than four hundred fifty (450) outpatient and surgical facilities across the United States. Tenet directs, controls, and conditions the participation of its subsidiary hospitals in vendor programs, including the Synthes rebate arrangement at the heart of this action. Tenet's corporate supply chain and procurement organization negotiates and administers system-wide vendor agreements on behalf of its subsidiary hospitals, including the

Subject Hospitals; Tenet's Vice President of marketing and product procurement, Phillip Gray, personally participated by telephone in the April 17, 2023 meeting at West Boca Medical at which enforcement of the Synthes arrangement was discussed, as alleged in Paragraphs 94 through 106 below; and Tenet, rather than either Subject Hospital, awarded the contract that permitted CarboFix orthopedic implants to be used at Tenet's South Florida facilities at the end of April 2023, as alleged in Paragraph 107 below.

15. Defendant Delray Medical Center, Inc. d/b/a Delray Medical Center ("Delray Medical") is a Florida for-profit corporation that operates a Level I trauma center, with a center for advanced orthopedic care, in Delray Beach, Florida. Delray Medical is a wholly owned subsidiary of Tenet.

16. Defendant West Boca Medical Center, Inc. d/b/a West Boca Medical Center ("West Boca Medical," and together with Delray Medical, the "Subject Hospitals") is a Florida for-profit corporation that operates an acute-care hospital in West Boca, Florida. West Boca Medical is a wholly owned subsidiary of Tenet.

## III. JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction over Florida FCA claims), and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court over actions brought under 31 U.S.C. §§ 3729 and 3730.

18. Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a). Defendants transact business and have engaged in the illegal conduct at issue within this District. The Subject Hospitals are located in this District,

and the kickback scheme caused the submission of false claims for procedures performed at facilities located in this District.

19. Relators have complied with 31 U.S.C. § 3730(b)(2) by serving a copy of the original Complaint and their written disclosures of substantially all material evidence and information in their possession upon the United States Attorney for the Southern District of Florida and the United States Attorney General. The original Complaint was filed under seal on July 11, 2023, and remained under seal during the United States' investigation, which was extended by Court order.

20. The facts supporting this action are based on Relators' personal knowledge, experience, communications, and investigation, including but not limited to their observations and communications while rendering services at the Subject Hospitals, and on Relators' analysis of hospital discharge data reported by the Subject Hospitals to AHCA and Medicare claims data maintained by CMS, as described in Section IX.I below.

**A. The Public Disclosure Bar Does Not Apply; Relators Are Original Sources.**

21. Pursuant to 31 U.S.C. § 3730(e)(4), as amended, this action is not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party. Neither the substantially same allegations nor the transactions alleged in this Complaint have been publicly disclosed (a) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (b) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (c) from the news media. Specifically, the existence and operation of the Synthes-Tenet 80-20 Rule rebate architecture, the surgeon-level in-kind inducements (including the provision of free physician assistant services), the executive bonus structure tied to

enforcement of the 80-20 Rule, and the coordinated exclusion of competing implant vendors at the Subject Hospitals have not been publicly disclosed. The government claims data on which Relators rely in Section IX.I below do not disclose any allegation or transaction of fraud; they are the raw records of the claims the Subject Hospitals submitted, and their significance is apparent only in light of the kickback arrangement that Relators, and only Relators, disclosed to the Government.

22. Even if any portion of the conduct alleged herein were somehow deemed to have been publicly disclosed, Relators are "original sources" within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relators' knowledge is derived from their direct, firsthand experience as industry insiders inside the operating rooms, supply-chain decisions, and vendor relationships at the Subject Hospitals during the relevant period, not from any public report, lawsuit, audit, or media account. Relators voluntarily provided the information forming the basis of this action to the Government before filing this action, as set forth in Relators' Disclosure Statement served on the United States Attorney for the Southern District of Florida and the United States Attorney General in accordance with 31 U.S.C. § 3730(b)(2).

23. The allegations and facts supporting this action have not been publicly disclosed through any of the sources enumerated in the Federal FCA, and Relators are original sources of the allegations herein.

**B. The First-to-File Bar Does Not Apply.**

24. Pursuant to 31 U.S.C. § 3730(b)(5), no person other than the Government may intervene or bring a related action based on the facts underlying a pending qui tam action. Upon information and belief, no related qui tam action based upon the facts alleged in this Complaint

was pending at the time the original Complaint was filed. Relators are the first to file with respect to the specific Synthes-Tenet 80-20 Rule kickback scheme alleged herein.

**C. The Action Is Timely; Limitations Are Tolled.**

25. This action is timely under 31 U.S.C. § 3731(b), which provides that a civil action under 31 U.S.C. § 3730 may not be brought (1) more than six (6) years after the date on which the violation of § 3729 is committed, or (2) more than three (3) years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than ten (10) years after the date on which the violation is committed, whichever occurs last.

26. The three-year tolling provision of § 3731(b)(2) is available to qui tam relators whether or not the United States has intervened. Defendants' affirmative concealment of the kickback scheme — including by structuring the rebate architecture as facially neutral commercial agreements, by causing executives to label the conduct as a "cost-saving initiative," and by retaliating against vendors who attempted to surface the scheme — prevented the responsible Government officials from discovering the operative facts until Relators' disclosure and the Government's subsequent multi-year investigation. Accordingly, all claims arising from conduct occurring on or after the later of (a) six (6) years before the filing of the original Complaint on July 11, 2023, and (b) three (3) years before the date on which Government officials charged with responsibility knew or reasonably should have known the material facts, are timely.

27. To the extent any cause of action herein would otherwise be subject to a different limitations period, that period is tolled by the doctrines of equitable tolling, fraudulent concealment, the continuing violations doctrine, and the discovery rule, each of which is independently invoked by Relators.

## IV. FEDERAL AND STATE HEALTHCARE PROGRAMS

28. The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. ("Medicare"), is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicare provides for the payment of hospital services, medical services, and certain medications for persons over sixty-five (65) years of age and others who qualify under the terms and conditions of the Medicare Program. Payments made under the Medicare Program include payment for services which are reasonable and medically necessary for the diagnosis or treatment of an illness or injury.

29. Medicare reimburses inpatient hospital services predominantly on a prospective basis under the Inpatient Prospective Payment System (IPPS) using Medicare Severity Diagnosis-Related Groups (MS-DRGs). Orthopedic trauma and reconstructive procedures performed on Medicare beneficiaries at acute-care hospitals such as the Subject Hospitals routinely fall within MS-DRGs covering major joint replacement, hip and femur procedures, lower-extremity and humerus procedures except major joint, and similar trauma-related DRGs, with reimbursement amounts per admission commonly ranging from approximately $15,000 to in excess of $40,000, and with substantial additional reimbursement for outlier cases, complications, comorbidities, and post-acute care.

30. Medicare Part C, 42 U.S.C. §§ 1395w-21 et seq. ("Medicare Advantage"), permits Medicare beneficiaries to receive their Medicare benefits through private Medicare Advantage organizations under contract with CMS. CMS pays each Medicare Advantage organization a monthly capitated amount for each enrolled beneficiary from the Medicare Trust Funds, and the

Medicare Advantage organization in turn pays hospitals, including the Subject Hospitals, for covered inpatient and outpatient services furnished to its enrollees. A hospital claim submitted to a Medicare Advantage organization for services furnished to a Medicare beneficiary is a claim for money a portion of which is provided by the United States within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii), and Medicare Advantage is a "Federal health care program" within the meaning of 42 U.S.C. § 1320a-7b(f). More than one-third of the internal fixation admissions reported by the Subject Hospitals to AHCA during the relevant period were billed to Medicare Advantage organizations rather than to traditional Medicare.

31. The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v ("Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue. Medicaid was designed to assist participating States in providing, among other things, hospital and medical services and prescription drugs to financially needy individuals who qualify for Medicaid.

32. Florida maintains a federally approved Medicaid program (the "Florida Medicaid Program") to reimburse healthcare charges made by physicians and other healthcare providers for the treatment of many low-income Florida citizens not covered by Medicare or private insurance. Claims submitted to the Florida Medicaid Program cause payments to be made by both the United States and the State of Florida (each contribute approximately half the cost of each claim submitted to the Florida Medicaid Program).

33. Providers apply to participate in the Florida Medicaid Program and agree, as a condition of both participation and payment, to comply with all the policies and procedures of the Florida Agency for Health Care Administration ("AHCA"), which administers the Florida Medicaid Program.

34. Florida delivers the substantial majority of Medicaid benefits through the Statewide Medicaid Managed Care program, under which AHCA pays capitated premiums, funded jointly by the United States and the State of Florida, to managed care plans that in turn pay hospitals, including the Subject Hospitals, for covered services furnished to their enrollees. Claims submitted by the Subject Hospitals to Florida Medicaid managed care plans, like claims submitted directly to AHCA, are claims for money a portion of which is provided by the United States and by the State of Florida within the meaning of 31 U.S.C. § 3729(b)(2) and Fla. Stat. § 68.082(1).

35. The Civilian Health and Medical Program of the Uniformed Services (known as "TRICARE") provides benefits for healthcare services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. TRICARE is administered by the Department of Defense and funded by the Federal Government.

## V. THE FEDERAL ANTI-KICKBACK STATUTE

36. The Medicare and Medicaid Patient Protection Act, also known as the "Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration and gifts given to those who can influence healthcare decisions corrupt medical decision-making and can result in the provision of goods and services that are more expensive, inferior, and/or medically unnecessary, or even harmful, to a vulnerable patient population. To protect the integrity of Government Healthcare Programs, Congress enacted a prohibition against the payment of kickbacks in any form.

37. The Anti-Kickback Statute, in pertinent part, prohibits any person or entity from knowingly and willfully offering or paying any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce that

person (A) to refer an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal healthcare program; or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal healthcare program. 42 U.S.C. § 1320a-7b(b)(2).

38. A transaction may violate the Anti-Kickback Statute even when a payor's unlawful intent is not its exclusive intent. It is enough that any one purpose of the remuneration is to induce or reward the referral or recommendation of business payable in whole or in part by a Federal healthcare program. A lawful purpose will not legitimize a payment that also has an unlawful purpose. This is the "one-purpose test," and it is dispositive of any defense Defendants may attempt to mount in this action.

39. Compliance with the Anti-Kickback Statute is a precondition to participation as a healthcare provider under Government Healthcare Programs, including Medicare. Moreover, compliance with the Anti-Kickback Statute is a condition of payment for any claims for which Medicare reimbursement is sought. Every provider who enters into a contract with Medicare specifically acknowledges in its provider contract that the provider understands "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all applicable conditions of participation in Medicare."

40. Hospitals participating in Medicare, including the Subject Hospitals, must also file an annual Medicare cost report (Form CMS-2552-10) for each fiscal year. The cost report must be signed by an officer or administrator of the hospital, who certifies that he or she is familiar with

the laws and regulations regarding the provision of health care services and that the services identified in the cost report were provided in compliance with such laws and regulations. The certification statement on the face of the cost report warns that misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil, and administrative action, fine, and imprisonment under federal law, and that "if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result." The cost report is also the vehicle through which a hospital that receives a discount or rebate on supplies must fully and accurately report that discount to Medicare in order to obtain the protection of the Discount Safe Harbor. 42 C.F.R. § 1001.952(h)(1)(iii).

41. The Anti-Kickback Statute was amended, effective March 23, 2010, to expressly provide that: "In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). Consequently, any kickbacks paid on or after March 23, 2010, that cause reimbursement claims to be presented to the Government for payment result in actionable false claims regardless of the provisions of any provider agreement.

42. A claim includes items or services resulting from a violation of the Anti-Kickback Statute when the unlawful remuneration is a but-for cause of the furnishing of the item or service included in the claim and, at a minimum, when there is a direct link between the remuneration and the item or service for which payment is sought. The claims at issue here satisfy either formulation. The item that resulted from Defendants' remuneration is the Synthes implant itself. Before the 80-20 Rule, the surgeons at the Subject Hospitals selected Trident, Stryker, and CarboFix implants

under standing supply agreements with the Subject Hospitals. After the 80-20 Rule, the Subject Hospitals removed those competing implants from their operating rooms, denied surgeons' specific requests to use them, and directed that Synthes products be substituted, for the stated purpose of meeting the rebate threshold. But for the rebates, the Subject Hospitals would not have excluded the competing implants, and the surgeons would have continued to select them, as they did before 2015 and as they repeatedly attempted to do thereafter; but for the free physician assistant services, Dr. David N. Buchalter would not have begun using Synthes implants, as more specifically alleged in Paragraph 81 below. Every claim for an admission or encounter in which a Synthes implant was used at the Subject Hospitals therefore includes an item that resulted from the kickbacks.

43. Because violations of the Anti-Kickback Statute render the providers ineligible for compensation, they are not entitled to any reimbursement, even for non-fraudulent services performed.

## VI. THE DISCOUNT SAFE HARBOR DOES NOT APPLY

44. Defendants have asserted and continue to assert that the year-end rebate payments from Synthes to Tenet and its subsidiary hospitals fall within the Anti-Kickback Statute's "Discount Safe Harbor," 42 U.S.C. § 1320a-7b(b)(3)(A), as implemented by 42 C.F.R. § 1001.952(h). This defense fails as a matter of law and fact.

45. The Discount Safe Harbor was promulgated by Congress and HHS to permit narrowly defined, properly disclosed price reductions in the sale or purchase of goods and services reimbursable by Federal healthcare programs, without exposing the parties to liability under the Anti-Kickback Statute. To qualify, a payment must satisfy each and every one of the regulation's

strict elements. The Safe Harbor is narrowly construed, and any payment that fails to satisfy each element falls entirely outside its protection.

46. Under 42 C.F.R. § 1001.952(h), to qualify as a protected "discount," a price reduction must, among other things: (a) be a fixed and disclosable reduction in price made at the time of sale or set in advance; (b) apply to the same good or service for which the federal healthcare program claim is submitted; (c) be properly disclosed and accurately reported by the buyer on its cost reports and/or claims to the Federal healthcare program; (d) not be tied to the referral of any other product, business, or service; and (e) not include cash payments, payments to influence referrals, or other forms of remuneration outside the narrow definition of a "discount."

47. Defendants' conduct fails the Discount Safe Harbor for at least five (5) independent and self-sufficient reasons, each of which independently removes the entire arrangement from the Safe Harbor's protection.

**A. The "Rebates" Are Tied to Market-Share Commitments and the Exclusion of Competitors, Not to the Price of Specific Products.**

48. The Discount Safe Harbor protects price reductions on specific items sold; it does not protect payments tied to a buyer's commitment to allocate market share or to exclude competitors. The Synthes-Tenet rebate is not a per-unit discount on Synthes implants. It is a contingent payment that is triggered only if and when the Subject Hospitals drive at least eighty percent (80%) of their trauma surgical volume into Synthes products and ensure no more than twenty percent (20%) of that volume goes to any competitor. This is a market-allocation and exclusion mechanism, not a price term. Synthes has confirmed in this action that the arrangement is memorialized in written agreements with the Hospital Defendants providing for "tiered" rebates (Dkt. 60 at 2 & n.3), that is, rebates whose amount rises as the Subject Hospitals' Synthes share

rises. Under such a structure the price of no individual Synthes implant is fixed or disclosable at the time of sale, because the amount ultimately paid for every implant purchased during the year depends on how successfully the hospital suppresses its surgeons' use of competing products through the end of the year. A rebate that is earned by the buyer's procedure share, including procedures in which no Synthes product was used, is not a discount "earned based on purchases of that same good or service," 42 C.F.R. § 1001.952(h)(1)(iii)(A), and is "[o]ther remuneration, in cash or in kind," that the regulation expressly excludes from the definition of a discount, 42 C.F.R. § 1001.952(h)(5).

49. Payments structured as "rebates" but conditioned on market-share guarantees and the exclusion of competitors fall outside the Discount Safe Harbor. Arrangements that reward the buyer for excluding competing products are not protected discounts; they are referral inducements that violate the Anti-Kickback Statute.

**B. The Arrangement Includes Substantial In-Kind Remuneration Outside Any Conceivable "Discount."**

50. The Discount Safe Harbor does not protect in-kind remuneration. The Synthes-Tenet arrangement includes, among other in-kind benefits flowing to referral sources and decision-makers: (a) free physician assistant services provided to surgeons who order Synthes products — a quintessential in-kind remuneration to the very physicians whose clinical judgment is intended to be protected from kickback inducement and whose decisions drive federal healthcare reimbursement; (b) cash bonuses paid by Tenet and the Subject Hospitals to operating-room directors, supply-chain managers, and other executives whose specific job responsibilities include enforcing the 80-20 Rule and excluding competing implant vendors; and (c) the in-kind value of an exclusive or near-exclusive market position protected by Tenet's administrative apparatus.

51. Any payment, gift, or other remuneration by a company to a physician — or to a hospital that influences physician decision-making — that has as one of its purposes the inducement of physicians to use or recommend the company's products is prohibited. The provision of free physician assistant labor to a surgeon, the economic value of which a surgeon would otherwise have to pay out of pocket, is precisely the kind of in-kind inducement the Anti-Kickback Statute was enacted to reach. It is not, and cannot be, a "discount" on Synthes implants.

**C. The Rebates Were Not Properly Disclosed or Accurately Reported.**

52. The Discount Safe Harbor is available to a hospital that reports its costs on a Medicare cost report only if the hospital "fully and accurately reports" the discount in the applicable cost report, 42 C.F.R. § 1001.952(h)(1)(iii)(C), and only if the seller fully and accurately reports the discount on the invoice, coupon, or statement and informs the buyer of its reporting obligations, 42 C.F.R. § 1001.952(h)(2)(iii). Because the Subject Hospitals are paid for inpatient admissions at fixed MS-DRG rates that do not vary with the cost of the implant used, no portion of any Synthes rebate was passed through to Medicare or to Florida Medicaid on any claim. The cost report was the only channel through which the programs could have shared in the "discount," and the Subject Hospitals' own cost reports show that they did not share the "discount" with the federal or state payors.

53. Relators have reviewed the Medicare cost reports (Form CMS-2552-10) that Delray Medical and West Boca Medical filed with CMS for each fiscal year from 2015 through 2024, as maintained in CMS's Healthcare Cost Report Information System. CMS requires a hospital to reduce its reported costs by the purchase discounts, refunds, and rebates it receives, to report the totals of each on Worksheet G-3 (lines 10 and 11) and as adjustments to expense on Worksheet A-8 (lines 4 and 5), and to identify on Worksheet A-8 the cost center whose expense each adjustment

reduces. A rebate on implants purchased for use in the operating room reduces the cost of implants, and the cost center to which such a rebate relates is "Implantable Devices Charged to Patients" (Worksheet A, line 72) or, for other surgical supplies, "Medical Supplies Charged to Patients" (Worksheet A, line 71).

54. In every fiscal year from 2015 through 2024, each Subject Hospital applied the entirety of its reported "Refunds and rebates of expenses" adjustment to a cost center that has nothing to do with implants. Delray Medical applied it, in all ten years, to "Capital Related Costs, Movable Equipment." West Boca Medical applied it to "Capital Related Costs, Movable Equipment" in fiscal years 2015 and 2016 and to "Administrative and General" in every year thereafter. Each Subject Hospital applied the entirety of its reported "Trade, quantity, and time discounts" adjustment to "Administrative and General" in every year. No cost report of either Subject Hospital for any fiscal year applied any discount, rebate, or refund adjustment to the implantable devices or medical supplies cost centers, and no cost report identifies any rebate, discount, or credit from Synthes, DePuy, or any orthopedic implant vendor, although the same reports separately itemize "other adjustments" as small as $85 for complimentary transportation and $5 for telephone services.

55. The totals reported by the Subject Hospitals are set out in the Table below. Each figure is the hospital's entire reported amount of purchase discounts, or of rebates and refunds, from every vendor and for every department for the fiscal year. Delray Medical, a Level I trauma center that billed Medicare more than $28 million in charges in 2015 for fee-for-service Internal Fixation Admissions alone, reported total rebates and refunds from all sources of $10,795 for that year and total purchase discounts of $6,220. West Boca Medical reported total purchase discounts of $2,271 for 2018 and $1,629 for 2022.

**Purchase Discounts and Rebates and Refunds Reported on the Subject Hospitals' Medicare Cost Reports, Fiscal Years 2015 through 2024 (Source: Form CMS-2552-10, Worksheet G-3, lines 10 and 11, and Worksheet A-8, lines 4 and 5, as filed in HCRIS)**

| Fiscal year | Delray Medical purchase discounts | Delray Medical rebates and refunds | Cost center reduced by rebates (Delray) | West Boca Medical purchase discounts | West Boca Medical rebates and refunds | Cost center reduced by rebates (West Boca) |
|---|---|---|---|---|---|---|
| 2015 | $6,220 | $10,795 | Capital, movable equipment | $5,823 | $35,838 | Capital, movable equipment |
| 2016 | $8,205 | $93,974 | Capital, movable equipment | $3,887 | $25,888 | Capital, movable equipment |
| 2017 | $1,544 | $193,976 | Capital, movable equipment | $4,520 | $124,684 | Administrative and general |
| 2018 | $1,151 | $161,716 | Capital, movable equipment | $2,271 | $68,556 | Administrative and general |
| 2019 | $2,923 | $135,390 | Capital, movable equipment | $2,467 | $83,478 | Administrative and general |
| 2020 | $21,478 | $318,376 | Capital, movable equipment | $9,210 | $155,618 | Administrative and general |
| 2021 | $25,258 | $152,653 | Capital, movable equipment | ($6,321) | $86,971 | Administrative and general |
| 2022 | $3,783 | $201,174 | Capital, movable equipment | $1,629 | $132,116 | Administrative and general |
| 2023 | $4,533 | $234,645 | Capital, movable equipment | $3,125 | $135,472 | Administrative and general |
| 2024 | $5,315 | $254,819 | Capital, movable equipment | $2,126 | $123,322 | Administrative and general |

56. The Synthes rebates were therefore not reported as reductions in the cost of the implants to which they related on the cost report of either Subject Hospital for any fiscal year from 2015 through 2024. To the extent Defendants contend that the rebates were paid to Tenet rather than to the Subject Hospitals, or were credited against implant expense in the Subject Hospitals' general ledgers without disclosure on the cost report, the rebates were not "fully and accurately report[ed] . . . in the applicable cost report" by the buyers within the meaning of 42 C.F.R. § 1001.952(h)(1)(iii)(C), and the Discount Safe Harbor is unavailable as a matter of regulatory text. Each of those cost reports was signed and certified by an officer or administrator of the Subject Hospital, who certified that the services identified in the report were provided in compliance with applicable laws and regulations and acknowledged the warning, printed on the face of the certification, concerning services procured through the payment of a kickback.

**D. The Arrangement Has, at Minimum, "One Purpose" of Inducing Referrals.**

57. Even if every other Safe Harbor element were satisfied (and they are not), the Safe Harbor cannot be invoked where any one purpose of the payment is to induce referrals. The very architecture of the 80-20 Rule — contingent payment, market-share enforcement, surgeon-level incentives, executive bonuses, and the elimination of competitors — demonstrates that referral inducement is not merely "one" purpose; it is the principal purpose.

58. Defendants' own personnel have admitted as much. On or about April 17, 2023, during a meeting at West Boca Medical attended by Goberville, CarboFix Regional Manager Ross Hughes ("Hughes"), and the surgeon Dr. Michael Krantzow ("Dr. Krantzow"), the Chief Financial Officer of West Boca Medical, Kim Cole ("Cole"), expressly stated that West Boca Medical had to achieve a certain percentage of usage with Synthes "to get rebates back for the hospital" and that, to do that, the hospital had "made the decision to strictly enforce their contracts and eliminate any other company that would hurt them in this endeavor to obtain the percentages they need." Cole's statement is the textbook definition of a referral-inducement scheme.

**E. The Arrangement Is Coupled with Coordinated Anti-Competitive Conduct That Itself Violates the Anti-Kickback Statute.**

59. Beyond the rebate itself, Defendants engaged in coordinated anti-competitive conduct designed to ensure that the rebate trigger was met: forcing competing implant vendors to remove their trauma trays from the Subject Hospitals on short notice; denying surgeons' clinical requests to use competing products despite their assessment of clinical superiority; cancelling and delaying surgeries when competing products were briefly required; and installing administrative gatekeepers with discretion to override surgeons' clinical judgment. This conduct falls categorically outside any "discount."

60. In short, the rebate is the flagpole, but the actual scheme is everything wrapped around it. The Discount Safe Harbor does not, and cannot, protect this conduct.

## VII. THE FEDERAL FALSE CLAIMS ACT

61. The Federal FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of law for which the affected government party may recover three times the amount of the damages the Government sustains and a civil monetary penalty per false claim, adjusted from time to time for inflation.

62. The Federal FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made a false record or statement to get a false or fraudulent claim paid or approved by the United States a violation of law for which the affected government party may recover three times the amount of damages and civil monetary penalties.

63. The Federal FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid liable for three times the amount of damages and civil monetary penalties.

64. The Federal FCA, 31 U.S.C. § 3729(a)(1)(G), establishes liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

65. The Federal FCA, 31 U.S.C. § 3729(b)(1), defines "knowing" and "knowingly" to mean that a person, with respect to relevant information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

66. The Federal FCA, 31 U.S.C. § 3729(b)(2), defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to the Government, its representative, contractor, grantee, or other person if the Government party in question provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

## VIII. THE FLORIDA FALSE CLAIMS ACT

67. The Florida FCA, Fla. Stat. §§ 68.081–68.092, is intended to deter persons and businesses from knowingly submitting false claims for payment, or causing such claims to be submitted, by the State of Florida. Most of the provisions of the Florida FCA exactly match those of the Federal FCA.

68. Under the Florida FCA, Fla. Stat. § 68.082(2) any person who: (i) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (ii) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; or (iii) conspires to commit a violation of this subsection is liable to the State of Florida for civil penalties and for treble the amount of damages the State of Florida sustains because of the act of that person.

## IX. FACTUAL ALLEGATIONS

### A. The Orthopedic Implant Industry and DePuy Synthes' Market Power.

69. DePuy Synthes is the world's largest manufacturer of implants used to mend bone fractures and is a leading producer of surgical power tools and advanced biomaterials. The supply and purchase of these products to hospitals is governed by contractual arrangements between

DePuy Synthes Sales and the hospital, supplemented by manufacturer rebate programs and master purchasing agreements at the corporate parent (Tenet) level.

70. Pursuant to DePuy Synthes Sales' contractual arrangements with hospitals, Synthes typically maintains an inventory of products on-site at the hospital. Based on a patient's particular needs, as determined by the treating physician, DePuy Synthes Sales' sales representatives hand the specific medical devices and equipment to the hospital's surgical staff, who then organize and sterilize them so that the subject implants can be used. At the Subject Hospitals, Synthes sales representatives were physically present in the operating rooms, controlled the consigned Synthes implant inventory, and, as alleged in Paragraph 114 below, were the personnel through whom the Subject Hospitals' administrators proposed to substitute Synthes product for the competing implants that surgeons had selected.

71. A central component of Synthes' sales strategy has been to target large hospital systems with rebate-based market-share programs. Tenet — the operator of approximately sixty-five (65) hospitals and over four hundred fifty (450) outpatient and surgical facilities across the country — was an especially valuable target because Tenet had the size, the leverage, and the corporate willingness to dictate purchasing behavior to its individual hospital subsidiaries and surgeons.

72. The 80-20 Rule is embodied in written agreements between Synthes and Tenet, on behalf of Tenet's subsidiary hospitals including the Subject Hospitals. Synthes has confirmed in this action that the rebates at issue were paid under "express agreements with the Hospital Defendants" and that those agreements provide for tiered rebates keyed to the Subject Hospitals' use of Synthes product (Dkt. 60 at 2 & n.3). Those agreements were negotiated and administered at the Tenet corporate level rather than by the Subject Hospitals individually. The Tenet officer

who participated in the April 17, 2023 enforcement meeting at West Boca Medical was Phillip Gray, Tenet's Vice President of marketing and product procurement, who appeared on behalf of Tenet rather than either Subject Hospital; West Boca Medical's Chief Financial Officer, Kim Cole, described the market-share requirement at that meeting as one that Tenet was enforcing against Stryker and other vendors as well; and the contract that permitted CarboFix to be used at Tenet's South Florida facilities was awarded by Tenet, not by either Subject Hospital. On the Synthes side, the agreements were negotiated and administered by Synthes' national accounts and contracting personnel responsible for large health-system agreements, and were implemented at the Subject Hospitals by the Synthes sales representatives assigned to those facilities. The names of the Synthes and Tenet contracting personnel who executed the agreements, and the dates, terms, and rebate tiers of the agreements, appear on the face of the agreements themselves, which Relators have requested in discovery.

**B. The 80-20 Rule and the Year-End Rebate.**

73. Beginning no later than 2015, Defendants entered into one or more written agreements pursuant to which Tenet, through its subsidiary hospitals, including Delray Medical and West Boca Medical, agreed that Synthes products would be used for at least eighty percent (80%) of the orthopedic implant surgeries performed at those facilities, whether expressed as a single market-share threshold or as tiers of increasing rebate culminating at that threshold. In exchange, Synthes agreed to pay substantial annual "rebates" to the hospitals (and/or to Tenet on behalf of the hospitals) at the end of each year, in amounts that depended on the Synthes share achieved. Tenet and the Subject Hospitals were therefore required to ensure that no more than twenty percent (20%) of the orthopedic implants used within their facilities were from non-Synthes suppliers in order to earn the full rebate. This arrangement is referred to herein as the "80-20 Rule."

The rebate was not a price term of any particular purchase: it was calculated after the fact by reference to the Subject Hospitals' success in steering their surgeons' implant selections to Synthes over the course of the year, and it was paid to the hospital as a lump sum after the year closed.

74. Although the 80-20 Rule was administered by Tenet at the corporate level, Relators' firsthand knowledge concerns its implementation and enforcement at the Subject Hospitals, and this Second Amended Complaint seeks recovery for the false claims submitted by the Subject Hospitals. Relators reserve the right to seek leave to amend to add claims arising at other Tenet facilities should discovery establish, as appears likely, that the same agreements were implemented elsewhere.

**C. Synthes Targeted the Subject Hospitals and Surgeon-Level Decision-Making.**

75. Prior to 2015, Relators had built valuable relationships with surgeons throughout South Florida who used Trident's and Stryker's orthopedic products on their patients at Delray Medical and West Boca Medical. Both Trident and Stryker had standing agreements with the Subject Hospitals to supply orthopedic surgery implants, as requested by surgeons based on those surgeons' informed judgment. Such relationships are typical industry-wide on a national basis.

76. However, from 2015 through the present, Stryker's and Trident's sales representatives were contacted by management personnel at Delray Medical and West Boca Medical, including Wanda Phillips, the Director of Delray Medical's operating room, in 2015; Christine Kesser, the Director of Supply Chain at West Boca Medical, in November 2022; Kim Cole, the Chief Financial Officer of West Boca Medical, in February 2023; and Donald Galloway, the Administrative Director of Surgical Services at Delray Medical, in May 2023 and instructed to remove their trauma trays and other equipment from the facilities, or to cease doing cases at the facilities altogether, in direct furtherance of the 80-20 Rule.

77. Specifically, in or about 2015, Wanda Phillips ("Phillips"), the Director of Delray Medical's operating room, approached Goberville and informed him that all of Stryker's and Trident's products needed to be removed from Delray Medical because the hospital intended to use Synthes implants.

78. The purpose of keeping trauma trays at hospitals is to allow surgeons to operate on trauma patients as soon as possible, without delaying treatment for sterilization of equipment that is not already on-site. As a direct result of the Subject Hospitals' decision to enforce the 80-20 Rule and remove competing implant trays, surgeries were cancelled or delayed while substitute implants or trauma trays were brought in.

79. Goberville approached the surgeons who used Trident's trauma products and advised them of his conversation with Phillips. Many of the surgeons protested and pushed back on Delray Medical's decision because it interfered with their ability to choose the implants that in their professional judgment best served their individual patients' clinical needs. Many of those surgeons were not familiar with the Synthes products and were concerned about clinical outcomes and potential professional liability.

**D. Tenet Orchestrated In-Kind Kickbacks to Surgeons and Bonuses to Executives.**

80. When Tenet realized that surgeons at the Subject Hospitals were resisting the directive to use Synthes products, Tenet, acting through the administration of Delray Medical, orchestrated an in-kind kickback scheme whereby it offered to provide physician assistants, employed and compensated by the hospital, free of charge to surgeons who agreed to order Synthes products for their cases.

81. Specifically, in or about the first quarter of 2018, Dr. David N. Buchalter ("Dr. Buchalter"), an orthopedic surgeon practicing at Delray Medical who had previously opposed the

directive at Delray Medical, told Goberville that Delray Medical had offered to provide him with a physician assistant, employed and paid by the hospital, to assist in his surgical cases at no cost to him if he used Synthes implants; that being provided a physician assistant free of charge, rather than having to compensate a physician assistant himself, was an incentive that was difficult for surgeons, including himself, to turn down; and that, based on the in-kind kickback of the free physician assistant, he would have to start using at least some Synthes implants. Goberville thereafter personally observed Dr. Buchalter using Synthes implants at Delray Medical in trauma procedures in which he had previously used competing products.

82. Tenet, through Delray Medical, thus arranged for the payment of the compensation of physician assistants at the Subject Hospitals in order to buy the surgeons' acquiescence and assist its corporate parent in achieving the 80% threshold pursuant to its agreement with Synthes. The physician assistant services were remuneration to the surgeons within the meaning of 42 U.S.C. § 1320a-7b(b)(2): a surgeon who employs his own physician assistant bears that cost as a practice expense, and a surgeon who is furnished a hospital-paid physician assistant for his cases receives the cost-free economic value of that labor. The remuneration was offered for the express purpose of inducing the surgeons to use Synthes implants, which the Subject Hospitals then billed to Medicare, Medicare Advantage organizations, Florida Medicaid, and TRICARE as part of the inpatient admission.

83. Dr. Buchalter further informed Goberville that Phillips, and other individuals in leadership roles at Delray Medical, were receiving bonuses for enforcing the 80-20 Rule. The bonuses paid to hospital executives, operating-room directors, supply-chain managers, and similar personnel were directly tied to enforcement of the 80-20 Rule and to the elimination of competing implant suppliers from the Subject Hospitals. Consistent with Dr. Buchalter's account, it was

Phillips who in 2015 directed the removal of Stryker and Trident products from Delray Medical, Kesser who in November 2022 directed the removal of CarboFix trays from West Boca Medical, Cole who in February 2023 barred Trident from both Subject Hospitals, and Galloway who in May 2023 demanded the removal of CarboFix trays from Delray Medical notwithstanding the contract Tenet had awarded to CarboFix weeks earlier.

**E. The Conduct Escalated and Trident Was Locked Out.**

84. While the enforcement was initially more prominent at Delray Medical, toward the end of 2022 the management personnel at both Delray Medical and West Boca Medical became more aggressive in enforcing the 80-20 Rule, and Trident was met with increased hostility.

85. On February 1, 2023, Trident received an email from Kim Cole ("Cole"), the Chief Financial Officer of West Boca Medical, advising that the hospital was starting a "cost-saving initiative" and that Trident was not to do cases at either West Boca Medical or Delray Medical after February 2, 2023.

86. Defendants' conduct has not only created an anti-competitive market, but has also corrupted medical decision-making by providing financial incentives to surgeons and hospital personnel to use Synthes products contrary to the medical judgment of the responsible surgeons, even when products judged by the surgeons to be superior are available in the market.

**F. The CarboFix Episode.**

87. Before Tenet ramped up its efforts to eliminate all competition at the Subject Hospitals, many surgeons had been using trauma products manufactured by CarboFix Orthopedics, Inc. ("CarboFix"), a Delaware for-profit corporation, which had been introduced to the surgeons by Goberville.

88. CarboFix and Trident products, in the judgment of responsible healthcare providers, offer unique benefits to trauma patients, including improved modulus of elasticity and decreased healing time for fractures.

89. CarboFix has been peer-reviewed and determined by many health care providers to offer many unique physical, chemical, and biological characteristics that can be exploited for many diverse applications, particularly when compared to traditional metallic implants. CarboFix has been found to be especially useful when associated with injuries of adjacent joints.

90. On or about November 3, 2022, Goberville was notified that he had twenty-four (24) hours to remove all trauma trays from West Boca Medical.

91. When Goberville sought an explanation from West Boca Medical's management as to why he was being asked to remove all trauma trays, he was met with hostility and excuses from Christine Kesser ("Kesser"), the Director/Manager of Supply Chain at West Boca Medical, about "reducing costs" for the hospital.

92. Ultimately, millions of dollars' worth of trauma trays, implants, and other equipment were in fact removed by hospital personnel from West Boca Medical and left out on the loading dock overnight.

93. During the first months of 2023, Dr. Michael Krantzow's ("Dr. Krantzow") requests to use CarboFix implants for surgeries at West Boca Medical were denied on at least two separate occasions, despite his medical opinion that the CarboFix implants were the best option for his patients. Those denials included the fixation of a complex calcaneus fracture in or about the first quarter of 2022 and the fixation of an ankle fracture in or about the first quarter of 2023. In each of those cases Goberville was personally present in the operating room; Dr. Krantzow had specifically requested authorization to use CarboFix carbon-fiber implants on the basis of the

patient's clinical presentation; West Boca Medical's administration denied the request; and Dr. Krantzow was constrained to fix the fracture with Synthes implants procured by West Boca Medical under the 80-20 Rule. Dr. Krantzow expressed his displeasure with being forced to use an inferior product, contemporaneously documented his clinical objection to the administrative override of his judgment, and indicated he would note the same in the medical records.

94. On April 17, 2023, Goberville, along with CarboFix's Regional Manager Ross Hughes ("Hughes"), met with various Tenet representatives and Dr. Krantzow to discuss pricing increases for the use of CarboFix, which had been approved for use on two cancer patients under the care of Dr. Krantzow.

95. The Tenet representatives present at the meeting were Cole, Kesser, and Chief Nursing Officer Ricardo J. Ramirez ("Ramirez"). Phillip Gray ("Gray"), who identified himself as Vice President of marketing and product procurement for Tenet, appeared by phone.

96. West Boca Medical's administration represented at the meeting that it was upset that the hospital was no longer receiving contract pricing for CarboFix. Cole stated that West Boca Medical's administration was closely looking at pricing and would not approve further cases should CarboFix continue to change list pricing.

97. Dr. Krantzow responded that "the solution is very simple, give [CarboFix] a contract."

98. At that point, Cole responded that CarboFix represented a very small percentage of the trauma business at Tenet's facilities and that the Defendants had made the decision to strictly enforce their cost-reduction initiatives because of the rising cost of healthcare. Cole then expanded on this point, expressly stating that West Boca Medical had to achieve a certain percentage of usage with Synthes "to get rebates back for the hospital and that to do that they made the decision

to strictly enforce their contracts and eliminate any other company that would hurt them in this endeavor to obtain the percentages they need." Cole's admission is a direct admission of a kickback-driven market-allocation scheme that violates the Anti-Kickback Statute.

99. Dr. Krantzow then told Cole that cutting out CarboFix would not help West Boca Medical achieve its goal, since she herself admitted that CarboFix was used in only a very small percentage of trauma cases at the facility. Dr. Krantzow suggested that perhaps West Boca Medical should focus its efforts on larger companies, like Stryker. Cole responded by saying that Tenet was "absolutely focusing on those companies as well," confirming that the lock-out was systemic and not limited to small competitors.

100. The conversation then continued by Dr. Krantzow verbally going over CarboFix's pricing, at which point Gray stated that CarboFix's pricing was actually much closer in line to Synthes pricing than to a lot of the other vendors.

101. Additionally, during the meeting, Ramirez spoke up and said: "I'm not sure if I am allowed to say this in front of these guys (the CarboFix representatives) so please, someone stop me immediately if I say something I shouldn't, but Dr. Krantzow, if we were to allow you to use CarboFix on all your trauma patients, can you find another way in your practice where you can use Synthes that you currently don't?"

102. In response, Dr. Krantzow said: "Ricardo, I only care about my patients and what's best for them in my practice. I'm a private practitioner and I'm always going to do what's best for my patients and to answer your question, the answer is absolutely not. I will not be using any Synthes, unless I feel there is a need to use them."

103. Based on the foregoing, it became evident that Tenet's issue with CarboFix had nothing to do with pricing and that CarboFix was being rejected by Tenet's personnel as part of the effort to push the 80-20 Rule.

104. Goberville and Hughes presented Tenet's representatives with copies of clinical studies which confirmed the positive results from using CarboFix, including studies by the Subject Hospitals' own affiliated clinicians.

105. At that point, Dr. Krantzow asked: "If it's not the clinical side and if it's not the pricing, what is it?" He continued, answering his own question: "I know exactly what it is! The issue is you guys aren't allowing me to use the products I want and need for my patients because you're doing everything you can to get to your percentage with Synthes so you can get your rebates back and that's more important to you than patient care."

106. At the conclusion of the meeting, Cole stated that West Boca Medical would review all the available information again and discuss internally whether an exception would be granted to CarboFix.

107. CarboFix ultimately received a contract from Tenet at the end of April 2023, which allowed surgeons to use CarboFix at all Tenet facilities in South Florida without going through a case-by-case approval process.

108. Notwithstanding, on May 16, 2023, Goberville received a text message and ultimately had a call with a newly installed Administrative Director of Surgical Services at Delray Medical, Donald Galloway ("Galloway"), who demanded that Goberville pick up his surgical trays from Delray Medical. According to Galloway, he had the ultimate authority to decide whether CarboFix could be used at Delray Medical, regardless of the contract, and surgeons must get administrative approval for each case.

109. This was just another example of the organized effort to force surgeons to use Synthes trauma products in order to obtain the rebates and kickbacks central to the 80-20 Rule.

**G. Patient-Care Consequences of the 80-20 Rule and the Clinical Superiority of Excluded Implant Systems.**

110. The 80-20 Rule did not merely allocate market share. It systematically forced surgeons performing federally reimbursed orthopedic trauma and reconstructive procedures at the Subject Hospitals to use Synthes implants in lieu of competing implants which, in the judgment of the responsible surgeons, were clinically superior and that those surgeons would otherwise have selected based on their independent medical judgment and on the specific clinical needs of their patients. The unlawful inducements paid by Defendants were not, and could not be, severable from the clinical decisions they corrupted.

111. Competing implant systems excluded from the Subject Hospitals by operation of the 80-20 Rule offered documented clinical advantages over the Synthes products to which the Subject Hospitals were contractually steered, including, without limitation: (a) titanium plating with poly-axial (variable-angle) locking screw capability, which is not available with the older stainless-steel plating predominantly supplied by Synthes under the 80-20 Rule and which titanium plating reduces both surgical time and tourniquet time; (b) anatomic implant designs reflecting current industry standards; (c) for CarboFix carbon-fiber products specifically, radiolucent properties that permit post-operative visualization of fracture healing on x-ray, a property not available with titanium or stainless-steel implants which obscure radiographic visualization of the underlying bone; (d) for CarboFix carbon-fiber products specifically, a modulus of elasticity closely approximating native bone, which is associated with quicker healing times and a more stable construct relative to metallic alternatives; (e) reduced infection risk; and (f) superior

resistance to implant breakage. These clinical advantages were known to the responsible surgeons and were the basis on which those surgeons, in the exercise of independent medical judgment, did and would have continued to select competing implants in the absence of the 80-20 Rule.

112. Surgeon familiarity with implant systems and instrumentation is a recognized determinant of operative efficiency and patient outcomes. Trauma and reconstructive procedures performed by surgeons using systems with which they are trained and experienced are completed in less operative time, with reduced risk of intra-operative complication, and with more predictable outcomes than the same procedures performed by surgeons forced to learn unfamiliar implants and instruments "on the fly" in live patients. The 80-20 Rule, by mandating Synthes products regardless of a surgeon's residency training, fellowship training, or accumulated practice experience with competing systems, systematically risked the erosion of the operative efficiency and patient-safety baseline at the Subject Hospitals.

113. Upon information and belief, and as observed by Relators in the operating rooms at the Subject Hospitals, following the award of the 80-20 Rule contracts, Synthes did not consistently staff the Subject Hospitals with adequate sales representation. A material percentage of Synthes-supplied cases at the Subject Hospitals proceeded "rep-less," meaning without the Synthes representative present in the operating room to support implant selection, tray management, and intra-operative substitution. The consigned implant trays maintained on-site at the Subject Hospitals were not consistently restocked or reorganized following procedures. As a direct and foreseeable result, surgeons performing federally reimbursed trauma procedures at the Subject Hospitals were repeatedly required to proceed with missing screw sizes, missing instruments, and incomplete implant inventories, and to substitute whatever implants happened to remain in the consigned trays. This is a degraded standard of operative practice that, in any

competitive market, would have caused the offending vendor to lose the surgeon's business. Under the 80-20 Rule, however, the surgeons had no recourse, because they were contractually steered to Synthes regardless of the defects and deficiencies in its operative-support performance.

114. The April 17, 2023, meeting at West Boca Medical described above was not an isolated event. On multiple occasions, surgeons practicing at the Subject Hospitals were required to meet with the Chief Financial Officer, Chief Executive Officer, or comparable senior administrative personnel of the relevant Subject Hospital, in order to request authorization to use competing implants judged by them to be clinically superior for use on specific patients, and to threaten to refer their patients to other facilities where they could use the products clinically indicated for those patients. The recurring necessity of CFO-level and CEO-level meetings to authorize the use of competing implants — meetings that would not occur in a properly functioning hospital procurement environment — is itself direct evidence that the 80-20 Rule operated as a referral-inducement scheme that placed corporate financial considerations ahead of physician clinical judgment. This pattern is directly documented. By way of example, on or about March 12, 2023, Dr. Kevin Palmer, a podiatric surgeon, scheduled a calcaneal fracture procedure at West Boca Medical Center for a patient referred to him by Dr. Gupta and requested Trident Orthopedics plates and screws — a competing implant system that Dr. Palmer had used for calcaneal fractures since 2015. On or about March 13, 2023, West Boca Medical Center's Chief Financial Officer, Kim Cole, advised Dr. Palmer in writing that the hospital was "unable to use" the requested competing implants "at this time," that she had "submitted the request for exceptional" approval, and that she could have "the Synthes rep work with" Dr. Palmer "to find a suitable alternative" — that is, to substitute a Synthes product for the competing implant the surgeon had selected. Dr. Palmer objected in writing, stating that the hospital's position was not acceptable, that he was

being asked to assume all of the clinical risk on a patient who had no insurance while every other participant in the procedure would be compensated, that he had used the requested equipment for many years, that he was unwilling to use an unfamiliar system "with no experience" on a live patient, and that unless the hospital either compensated him at the Medicare fee schedule or permitted him to use the equipment he had requested, he would be forced to cancel the case. That a hospital Chief Financial Officer — rather than any clinician — personally adjudicated and initially denied a surgeon's intra-operative implant selection, and proposed substituting Synthes product through the Synthes representative, is direct documentary evidence that the 80-20 Rule subordinated physician clinical judgment to the corporate financial objective of protecting the Synthes rebate.

115. The pattern of administrative denial of surgeon requests to use clinically superior competing implants was documented contemporaneously. Among other documentation, Dr. Krantzow's repeated requests to use CarboFix implants for specific trauma patients at West Boca Medical were denied by West Boca Medical administration on multiple occasions in late 2022 and early 2023, and those denials are reflected in contemporaneous email correspondence and meeting notes preserved by Relators. Additional surgeons practicing at the Subject Hospitals, including but not limited to Dr. Manish Gupta, Dr. Peter Merkle, Dr. David Padden, Dr. Jacob Landes, and Dr. Mirylsa Colon-Martinez, were comparably affected by the administrative override of clinical judgment caused by the 80-20 Rule. The administrative obstruction documented by Relators was not limited to West Boca Medical. Dr. Russell Weisz, a trauma surgeon practicing at Delray Medical, had used Trident implants with the support of Trident's representative for years before Trident was barred from the Subject Hospitals in February 2023. On May 19, 2023, after Relator Wallace thanked him for his support through "the current and ongoing struggles" at Delray

Medical, Dr. Weisz replied that he appreciated "the help and support" he had received "over the years" and that he was "[t]rying to get things right but not easy dealing with a hospital system," a contemporaneous acknowledgment by a treating surgeon that the hospital system, and not clinical judgment, was controlling the implants available to him at Delray Medical.

**H. The Universe of False Claims Submitted Pursuant to the 80-20 Rule.**

116. The conduct alleged above caused, and continues to cause, the submission of a substantial universe of false claims to Medicare, to Medicare Advantage organizations, to the Florida Medicaid Program and its managed care plans, and to TRICARE. Relators have identified that universe from two sources of government data, each of which records claims that the Subject Hospitals themselves submitted: (a) the inpatient hospital discharge data that every licensed Florida hospital, including each Subject Hospital, is required by Florida law to report to AHCA for each patient discharged, which AHCA makes available to the public, and which records, for each discharge, the facility, the admission and discharge dates, the principal and secondary diagnoses, the ICD-9-CM or ICD-10-PCS procedure codes, the MS-DRG assigned, the expected payer, the attending and operating physicians, and the total charges billed; and (b) the Medicare Inpatient Standard Analytical File maintained by CMS, which contains the final action fee-for-service Part A claims that hospitals submitted to Medicare and that Medicare paid, including for each claim the hospital's CMS Certification Number, the claim from and through dates, the MS-DRG, the procedure codes, the operating physician, the total charges, and the amount Medicare actually paid (together, the "Government Claims Data"). Relators' analysis of the Government Claims Data is described in Section IX.I below.

117. At the Subject Hospitals. From 2015 through the present, Delray Medical operated a Level I trauma center, and West Boca Medical operated an acute-care hospital with an active

emergency department and orthopedic surgical program. According to the Government Claims Data, between January 1, 2015 and December 31, 2024 the Subject Hospitals submitted to Medicare, and Medicare paid, 6,130 fee-for-service inpatient claims in the MS-DRGs covering hip, femur, lower-extremity, upper-extremity, foot, and other orthopedic trauma procedures identified in Paragraph 124 below, on which Medicare paid $76,492,454.11, and 3,320 of those claims carried a procedure code for the insertion or repositioning of an internal fixation device of the kind supplied by Synthes, on which Medicare paid $42,036,779.45. Over the same period, and through June 30, 2025, the Subject Hospitals reported to AHCA a further 2,092 internal fixation admissions billed to Medicare Advantage organizations and 434 internal fixation admissions billed to the Florida Medicaid Program and its managed care plans. Under the 80-20 Rule, Synthes implants were used in at least eighty percent (80%) of the trauma procedures performed at the Subject Hospitals. The Subject Hospitals billed Medicare, the Medicare Advantage organizations, the Florida Medicaid Program and its managed care plans, and TRICARE for each such admission in the ordinary course of their operations on Form CMS-1450 (UB-04) or its electronic equivalent, grouping each inpatient stay into the applicable MS-DRG for reimbursement. Each claim for an admission in which a Synthes implant was used was a false claim within the meaning of 42 U.S.C. § 1320a-7b(g), 31 U.S.C. § 3729, and the Florida False Claims Act because the implant included in the claim was procured, selected, and used pursuant to the 80-20 Rule kickback arrangement.

118. *Relators' Firsthand Observation of Synthes Implant Use at the Subject Hospitals.* From 2015 through 2023, Goberville was physically present in the operating rooms of Delray Medical and West Boca Medical on numerous occasions (on average approximately three to five times per week), delivering trauma trays, exchanging implants and instrumentation, and attending the procedures in which those implants were used. In that capacity Goberville personally observed

Synthes trauma implants being selected and implanted in hundreds of orthopedic trauma and reconstructive procedures at the Subject Hospitals after the 80-20 Rule took effect, including proximal femoral and cephalomedullary nails for hip and intertrochanteric fractures, tibial intramedullary nails, distal femoral and proximal humerus locking plates, volar plates for distal radius fractures, distal tibia and fibula plating, calcaneal and other foot plating, and syndesmotic fixation hardware. Before the 80-20 Rule, Goberville delivered Trident and Stryker trays to the same operating rooms for the same categories of procedures, performed by the same surgeons; after it, those trays were gone, and the surgeons who had used them, including surgeons who had routinely selected systems offering poly-axial locking screw capability that the Synthes plates lacked and surgeons who had expressed a clinical preference for CarboFix carbon-fiber implants, were using Synthes product.

119. *The Identified Surgeons.* The surgeons practicing at the Subject Hospitals whose implant selection was bought or overridden in furtherance of the 80-20 Rule, as alleged in Paragraphs 79, 81, 93, 114, and 115 above, include Dr. David N. Buchalter (Delray Medical), Dr. Michael Krantzow (West Boca Medical), Dr. Kevin Palmer (West Boca Medical), Dr. Manish Gupta, Dr. Peter Merkle, Dr. David Padden, Dr. Jacob Landes, Dr. Mirylsa Colon-Martinez, and Dr. Russell Weisz (Delray Medical) (together, the "Identified Surgeons"). Goberville personally observed Synthes trauma implants being used in procedures performed by each of the Identified Surgeons at the Subject Hospitals after the 80-20 Rule was implemented.

120. The trauma procedures Goberville observed were performed, in the substantial majority, on elderly patients, as is characteristic of hip, femur, and other fragility-fracture fixation at a Level I trauma center and an acute-care hospital serving southern Palm Beach County. Relators do not rely on the apparent age of any patient to plead that a claim was submitted. The Government

Claims Data establish that Medicare or a Medicare Advantage organization was the expected payer for 5,539 of the Internal Fixation Admissions the Subject Hospitals reported to AHCA from January 1, 2015 through June 30, 2025, and that Medicare in fact paid 3,320 fee-for-service claims for such admissions through December 31, 2024, as set forth in Section IX.I below.

121. The Surgeon-Level Channel. Within the universe of false claims described above, a meaningful subset was generated by procedures performed by the Identified Surgeons, whose product choice was directly influenced by Tenet's in-kind kickback of free physician assistant services (as expressly admitted to Goberville by Dr. Buchalter) and by Defendants' administrative override of clinical judgment (as occurred repeatedly with Dr. Krantzow in late 2022 and early 2023, with Dr. Palmer in March 2023, and as confirmed by Kim Cole at the April 17, 2023 meeting). The Government Claims Data identify each Internal Fixation Admission at the Subject Hospitals in which an Identified Surgeon was the operating physician, as alleged in Paragraph 131 below. Each procedure within this surgeon-level subset generated false claims that are independently actionable, in addition to the broader universe of false claims arising from the 80-20 Rule architecture itself.

122. The Time Period and Continuing Nature of the Violations. The universe of false claims runs from at least January 1, 2015 through the present and is continuing. Defendants' conduct constitutes a continuing violation of the Anti-Kickback Statute, the Federal False Claims Act, and the Florida False Claims Act. Each new procedure performed under the 80-20 Rule architecture generates a new false claim and, with respect to such new false claim, re-starts the limitations clock.

**I. The Government Claims Data Confirm the Submission and Payment of the False Claims.**

123. Relators, through counsel and a consultant retained by counsel, obtained and analyzed the Government Claims Data described in Paragraph 116 above for the Subject Hospitals for the period beginning January 1, 2015 and running through the most recent period available (December 31, 2024 for the CMS Medicare fee-for-service data, and June 30, 2025 for the AHCA discharge data). The AHCA data were reported to AHCA by the Subject Hospitals themselves pursuant to Fla. Stat. § 408.061 and Chapter 59E-7 of the Florida Administrative Code, and are the Subject Hospitals' own record of the patients they discharged, the procedures they performed, the payers they billed, and the charges they billed. The CMS data are Medicare's own record of the claims the Subject Hospitals submitted and the amounts Medicare paid on them.

124. Relators identified the universe of orthopedic trauma and reconstructive admissions by selecting the MS-DRGs into which such admissions are grouped: MS-DRGs 480 through 482 (Hip and Femur Procedures Except Major Joint); 469 and 470 (Major Hip and Knee Joint Replacement or Reattachment of Lower Extremity); 521 and 522 (Hip Replacement with Principal Diagnosis of Hip Fracture); 492 through 494 (Lower Extremity and Humerus Procedures Except Hip, Foot and Femur); 503 through 505 (Foot Procedures); 507 and 508 (Major Shoulder or Elbow Joint Procedures); 510 through 512 (Shoulder, Elbow or Forearm Procedures Except Major Joint); 513 and 514 (Hand or Wrist Procedures Except Major Thumb or Joint); 495 through 499 (Local Excision and Removal of Internal Fixation Devices); 515 through 517 (Other Musculoskeletal System and Connective Tissue O.R. Procedures); 906 (Hand Procedures for Injuries); 907 through 909 (Other O.R. Procedures for Injuries); and 956 through 959 (Limb Reattachment, Hip and Femur Procedures, and Other O.R. Procedures for Multiple Significant Trauma). Relators then identified, within that universe, the admissions in which an internal fixation device was implanted,

by selecting the admissions carrying an ICD-10-PCS procedure code in table 0PH, 0QH, 0PS, or 0QS (insertion or reposition of upper or lower bones) with device value 4 (internal fixation device) or 6 (intramedullary internal fixation device) and, for discharges before October 1, 2015, the corresponding ICD-9-CM procedure codes for open and closed reduction of fracture with internal fixation, internal fixation of bone without fracture reduction, and related internal fixation procedures (the "Internal Fixation Admissions"). Internal fixation plates, screws, and intramedullary nails are the trauma implants that Synthes supplied to the Subject Hospitals under the 80-20 Rule and that Relators observed being used in the procedures described above.

125. *Medicare fee-for-service claims.* The CMS data establish that the Subject Hospitals submitted, and Medicare paid, the following fee-for-service inpatient claims for Internal Fixation Admissions, by hospital and by year, from January 1, 2015 through December 31, 2024. In total, the Subject Hospitals submitted and Medicare paid 3,320 such claims, for 3,265 Medicare beneficiaries, on which the Subject Hospitals billed $557,484,795.68 in charges and Medicare paid $42,036,779.45:

**Table A: Medicare Fee-for-Service Inpatient Claims Paid for Internal Fixation Admissions at the Subject Hospitals, 2015–2024 (Source: CMS Inpatient Standard Analytical File)**

| Year | Delray Medical claims paid | Delray Medical Medicare payments | West Boca Medical claims paid | West Boca Medical Medicare payments | Total claims paid | Total Medicare payments |
|---|---|---|---|---|---|---|
| 2015 | 292 | $3,107,209.39 | 67 | $786,227.06 | 359 | $3,893,436.45 |
| 2016 | 257 | $2,804,993.54 | 61 | $751,972.66 | 318 | $3,556,966.20 |
| 2017 | 264 | $3,055,044.48 | 81 | $932,211.34 | 345 | $3,987,255.82 |
| 2018 | 277 | $3,401,149.50 | 60 | $753,227.15 | 337 | $4,154,376.65 |
| 2019 | 294 | $3,825,070.58 | 55 | $643,839.61 | 349 | $4,468,910.19 |
| 2020 | 258 | $3,436,696.62 | 63 | $768,619.02 | 321 | $4,205,315.64 |
| 2021 | 294 | $4,057,415.55 | 60 | $802,848.18 | 354 | $4,860,263.73 |
| 2022 | 257 | $3,686,441.89 | 40 | $508,489.54 | 297 | $4,194,931.43 |
| 2023 | 269 | $3,639,807.25 | 51 | $645,944.12 | 320 | $4,285,751.37 |
| 2024 | 271 | $3,796,481.69 | 49 | $633,090.28 | 320 | $4,429,571.97 |
| **Total** | **2,733** | **$34,810,310.49** | **587** | **$7,226,468.96** | **3,320** | **$42,036,779.45** |

126. *Medicare Advantage claims*. The AHCA data establish that the Subject Hospitals reported the following Internal Fixation Admissions with a Medicare managed care (Medicare Advantage) plan as the expected payer, by hospital and by year, from January 1, 2015 through June 30, 2025, together with the total charges the Subject Hospitals billed for those admissions. In total, the Subject Hospitals reported 2,092 such admissions, on which they billed $386,488,656 in charges to Medicare Advantage organizations:

**Table B: Internal Fixation Admissions Billed to Medicare Advantage Organizations by the Subject Hospitals, 2015–June 2025 (Source: AHCA Hospital Inpatient Discharge Data)**

| Year | Delray Medical admissions | Delray Medical charges billed | West Boca Medical admissions | West Boca Medical charges billed | Total admissions | Total charges billed |
|---|---|---|---|---|---|---|
| 2015 | 140 | $12,621,531 | 45 | $2,699,339 | 185 | $15,320,870 |
| 2016 | 125 | $14,123,145 | 26 | $1,922,477 | 151 | $16,045,622 |
| 2017 | 129 | $18,054,649 | 51 | $4,646,780 | 180 | $22,701,429 |
| 2018 | 128 | $19,596,907 | 40 | $4,387,908 | 168 | $23,984,815 |
| 2019 | 146 | $26,698,645 | 41 | $4,681,624 | 187 | $31,380,269 |
| 2020 | 145 | $26,803,493 | 48 | $5,941,985 | 193 | $32,745,478 |
| 2021 | 179 | $39,239,373 | 46 | $7,404,329 | 225 | $46,643,702 |
| 2022 | 171 | $41,562,046 | 39 | $6,861,453 | 210 | $48,423,499 |
| 2023 | 180 | $46,368,519 | 47 | $7,957,650 | 227 | $54,326,169 |
| 2024 | 190 | $53,676,178 | 45 | $8,123,832 | 235 | $61,800,010 |
| 2025 (Jan.–June) | 105 | $27,280,863 | 26 | $5,835,930 | 131 | $33,116,793 |
| **Total** | **1,638** | **$326,025,349** | **454** | **$60,463,307** | **2,092** | **$386,488,656** |

127. *Florida Medicaid claims*. The AHCA data establish that the Subject Hospitals reported the following Internal Fixation Admissions with the Florida Medicaid Program or a Florida Medicaid managed care plan as the expected payer from January 1, 2015 through June 30, 2025: 289 admissions at Delray Medical, on which Delray Medical billed $104,339,539 in charges, and 145 admissions at West Boca Medical, on which West Boca Medical billed $11,889,197 in charges, for a total of 434 admissions and $116,228,736 in charges billed to the Florida Medicaid Program and its managed care plans, distributed by year as follows:

**Table C: Internal Fixation Admissions Billed to the Florida Medicaid Program and Florida Medicaid Managed Care Plans by the Subject Hospitals, 2015–June 2025 (Source: AHCA Hospital Inpatient Discharge Data)**

| Year | Florida Medicaid and Medicaid managed care admissions (both Subject Hospitals) | Charges billed (both Subject Hospitals) |
|---|---|---|
| 2015 | 47 | $6,050,468 |
| 2016 | 30 | $5,271,869 |
| 2017 | 35 | $8,729,748 |
| 2018 | 44 | $12,675,086 |
| 2019 | 50 | $12,860,317 |
| 2020 | 52 | $13,515,580 |
| 2021 | 53 | $19,580,218 |
| 2022 | 41 | $11,621,872 |
| 2023 | 36 | $11,720,546 |
| 2024 | 28 | $8,737,911 |
| 2025 (Jan.–June) | 18 | $5,465,121 |
| **Total** | **434** | **$116,228,736** |

128. The two data sources corroborate one another. For the same Internal Fixation Admissions, the AHCA data report 3,447 discharges with traditional Medicare as the expected payer through June 30, 2025 (2,838 at Delray Medical and 609 at West Boca Medical), and the CMS data report 3,320 claims actually paid by Medicare through December 31, 2024. That correspondence confirms that the discharges the Subject Hospitals reported to the State as Medicare admissions were in fact billed to, and paid by, Medicare.

129. The Internal Fixation Admissions are a conservative subset of the claims tainted by the 80-20 Rule. Across all of the orthopedic trauma and reconstructive MS-DRGs identified in Paragraph 124 above, the CMS data show 6,130 fee-for-service inpatient claims submitted by the Subject Hospitals and paid by Medicare from January 1, 2015 through December 31, 2024, involving 6,065 Medicare beneficiaries, on which the Subject Hospitals billed $995,129,791.32 in charges and Medicare paid $76,492,454.11. The figures pleaded in this Section also exclude outpatient hospital encounters, claims billed to TRICARE and the Department of Veterans Affairs,

and Medicare fee-for-service claims for calendar year 2025, each of which will add to the universe of false claims.

130. Under the 80-20 Rule, Synthes implants were used in no fewer than eighty percent (80%) of the trauma procedures performed at the Subject Hospitals. The Government Claims Data do not identify the manufacturer of the implant used in any particular admission, because neither the UB-04 claim form nor the AHCA discharge record contains a field for the manufacturer of an implant. The identity of the implant used in each Internal Fixation Admission is recorded in the Subject Hospitals' operative reports, implant logs, and materials management and charge-master records, and in Synthes' consignment and sales records for the Subject Hospitals, all of which are in Defendants' possession. But the 80-20 Rule itself fixes the floor: at least 2,656 of the 3,320 Medicare fee-for-service Internal Fixation Admissions, at least 1,673 of the 2,092 Medicare Advantage Internal Fixation Admissions, and at least 347 of the 434 Florida Medicaid Internal Fixation Admissions involved a Synthes implant procured, selected, and used under the 80-20 Rule, and each claim for such an admission was a false claim. The surgeon-level allegations in Paragraph 131 below identify, within that universe, the admissions in which the operating surgeon was one of the Identified Surgeons.

131. *Internal Fixation Admissions of the Identified Surgeons.* The AHCA discharge record for each Internal Fixation Admission identifies the operating physician by Florida license number. Relators have identified from the AHCA data each Internal Fixation Admission at the Subject Hospitals from January 1, 2015 through June 30, 2025 in which an Identified Surgeon was the operating physician and Medicare, a Medicare Advantage organization, or the Florida Medicaid Program or one of its managed care plans was the expected payer. For eight of the nine Identified Surgeons, those admissions number 2,156 in total, comprising 1,216 admissions billed

to Medicare, 791 billed to Medicare Advantage organizations, and 149 billed to the Florida Medicaid Program and its managed care plans, on which the Subject Hospitals billed $374,090,759 in charges, distributed by surgeon as set out in Table D below. Because the Subject Hospitals removed competing implant systems from their operating rooms and denied the Identified Surgeons' requests to use them except in the isolated instances described above, the internal fixation implant in each such admission was, with those isolated exceptions, a Synthes implant procured under the 80-20 Rule, and each claim for such an admission was a false claim. The admission date, MS-DRG, procedure codes, and charges for each such admission are reflected in the AHCA data, and the corresponding claims are identifiable in the Subject Hospitals' own billing records.

**Table D: Internal Fixation Admissions at the Subject Hospitals in Which an Identified Surgeon Was the Operating Physician, by Payer, 2015–June 2025 (Source: AHCA Hospital Inpatient Discharge Data; Florida Medicaid admissions reported in the aggregate in the preceding paragraph)**

| Identified Surgeon | Medicare admissions | Medicare Advantage admissions | Medicare and Medicare Advantage admissions | Total charges billed (all government payers) |
|---|---|---|---|---|
| Dr. Russell Weisz | 625 | 353 | 978 | $185,466,336 |
| Dr. Michael Krantzow | 171 | 178 | 349 | $62,297,427 |
| Dr. David N. Buchalter | 233 | 118 | 351 | $63,857,771 |
| Dr. Mirylsa Colon-Martinez | 69 | 39 | 108 | $20,540,353 |
| Dr. Peter Merkle | 50 | 35 | 85 | $15,328,691 |
| Dr. Kevin Palmer | 27 | 23 | 50 | $10,923,553 |
| Dr. Manish Gupta | 30 | 25 | 55 | $7,655,924 |
| Dr. Jacob Landes | 11 | 20 | 31 | $8,020,704 |
| **Total (eight surgeons)** | **1,216** | **791** | **2,007** | **$374,090,759** |

132. Each of the claims reflected in Tables A through D above was submitted by Delray Medical or West Boca Medical, as the case may be, to Medicare, to a Medicare Advantage organization, or to the Florida Medicaid Program or one of its managed care plans, on Form CMS-1450 (UB-04) or its electronic equivalent; was paid; and was submitted at a time when the relevant Subject Hospital had certified, in its Medicare enrollment and in each of its annual Medicare cost

reports, that its claims and the underlying transactions complied with the Anti-Kickback Statute and that the services it billed had not been procured through the payment of a kickback, as alleged in Paragraphs 39 and 40 above.

## X. DEFENDANTS' KNOWLEDGE AND WILLFULNESS

133. Each Defendant acted knowingly within the meaning of 31 U.S.C. § 3729(b)(1) and knowingly and willfully within the meaning of 42 U.S.C. § 1320a-7b(b). The facts supporting that allegation are specific to each Defendant and are set forth below.

134. *Tenet, Delray Medical, and West Boca Medical.* Tenet is among the most experienced participants in the Medicare program in the country and has been under the closest possible scrutiny with respect to the Anti-Kickback Statute throughout the relevant period. In October 2016, Tenet and two of its subsidiaries resolved criminal charges and civil False Claims Act claims arising from kickbacks paid to a clinic operator in exchange for patient referrals, paying more than $513 million, and Tenet entered into a five-year Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services that obligated Tenet and its subsidiary hospitals, including the Subject Hospitals, to maintain compliance programs, to train personnel on the Anti-Kickback Statute, and to review and track arrangements with referral sources. The 80-20 Rule, the free physician assistant services to surgeons, and the bonuses to hospital personnel for excluding competing vendors were implemented and enforced at the Subject Hospitals during the term of that Corporate Integrity Agreement. Tenet and the Subject Hospitals thus knew precisely what the Anti-Kickback Statute prohibits and structured and enforced the arrangement anyway.

135. The conduct of the Subject Hospitals' own senior administrators reflects consciousness that what they were doing was unlawful. West Boca Medical's Chief Nursing

Officer, Ricardo Ramirez, prefaced his request that Dr. Krantzow find "another way in [his] practice" to use Synthes product with the statement, "I'm not sure if I am allowed to say this in front of these guys . . . so please, someone stop me immediately if I say something I shouldn't." West Boca Medical's Chief Financial Officer, Kim Cole, described the arrangement to vendors as a "cost-saving initiative" while telling a surgeon in the same room that the hospital had to reach a Synthes usage percentage "to get rebates back for the hospital." The decision whether a surgeon could use a competing implant for a specific patient was reserved to the Chief Financial Officer, not to any clinician. And Delray Medical's Administrative Director of Surgical Services, Donald Galloway, asserted the authority to override, case by case, the contract that Tenet itself had awarded to CarboFix. These are not the acts of personnel who believed they were administering a lawful discount.

136. Tenet and the Subject Hospitals knew that the rebates were not being reported to Medicare in the manner the Discount Safe Harbor requires, because each Subject Hospital prepared, and its chief financial officer or administrator certified, the annual cost reports described in Paragraphs 53 through 56 above, none of which reports any rebate as a reduction in the cost of implants; and they knew that the physician assistant services furnished to surgeons and the bonuses paid to hospital personnel for excluding competing vendors were remuneration that no safe harbor protects. No Defendant sought an advisory opinion from the Office of Inspector General concerning the arrangement.

137. *Synthes.* Synthes designed the tiered market-share rebate structure, tracked the Subject Hospitals' Synthes utilization percentage in order to calculate the rebates, and therefore knew that its rebates were conditioned on the Subject Hospitals' suppression of their surgeons' use of competing implants rather than on the price of any Synthes product. Synthes' sales

representatives were present in the operating rooms of the Subject Hospitals and were the personnel through whom the Subject Hospitals' administrators proposed to substitute Synthes implants for the competing implants surgeons had selected, as Cole's March 13, 2023 email to Dr. Palmer confirms; Synthes therefore knew, through its representatives at the Subject Hospitals, that the rebate threshold was being met by administrative exclusion of competitors and override of surgeon selection. Synthes is also a sophisticated and repeat participant in the Federal health care programs with specific knowledge of the Anti-Kickback Statute: in September 2007, DePuy Orthopaedics, Inc., an affiliate of the Synthes Defendants within the Johnson & Johnson family of orthopedic companies, entered into a deferred prosecution agreement with the United States Attorney's Office for the District of New Jersey and a civil settlement resolving allegations that it paid kickbacks to orthopedic surgeons to induce the use of its implants, and accepted a federal monitor. Synthes has further acknowledged in this action that it made a presentation to the Department of Justice concerning its "compliance with the discount safe harbor" (Dkt. 60 at 8), which confirms that Synthes understood the rebate arrangement to be lawful only if it satisfied each element of the safe harbor. Synthes knew that the arrangement did not.

138. Defendants' knowledge is further demonstrated by their concealment of the arrangement. The rebates were structured as year-end payments rather than invoice-level price reductions; the exclusion of competitors was described to vendors and surgeons as a "cost-saving initiative"; and no Defendant disclosed to Medicare, to any Medicare Advantage organization, or to the Florida Medicaid Program that the implants for which the Subject Hospitals were billing had been selected pursuant to a market-share rebate arrangement coupled with in-kind remuneration to surgeons and bonuses to hospital personnel.

## XI. DAMAGES TO THE UNITED STATES AND THE STATE OF FLORIDA

139. Since at least 2015 through the present, Defendants received substantial revenues from the sale and use of Synthes products on patients at the Subject Hospitals.

140. When a kickback has been paid in connection with a healthcare claim, one measure of damages is the full amount of the kickback-tainted claim — not merely the markup or rebate amount. That is because, under 42 U.S.C. § 1320a-7b(g), kickback-tainted claims are false claims in their entirety, and providers who pay or receive kickbacks are not entitled to any reimbursement under Federal healthcare programs, even for non-fraudulent services performed.

141. Accordingly, the measure of damages here includes (a) the entire Medicare, Medicare Advantage, Medicaid, and TRICARE reimbursement for each Synthes implant used in any procedure performed at the Subject Hospitals from 2015 through the present under the 80-20 Rule architecture, and (b) the entire Medicare, Medicare Advantage, Medicaid, and TRICARE reimbursement for each related surgical procedure (including DRG payments covering operating-room time, hospital stay, ancillary services, and any bundled facility component) using such implants.

142. Trauma surgery DRG payments and related implant reimbursements are substantial. Reimbursement for a single qualifying orthopedic trauma admission, including the implant and the bundled facility services, commonly runs into the tens of thousands of dollars and, in complex cases, well in excess of that figure.

143. Defendants' conduct caused the submission of false claims for: (a) every orthopedic trauma and reconstructive procedure performed using Synthes implants at Delray Medical from 2015 through the present; and (b) every orthopedic trauma and reconstructive procedure performed using Synthes implants at West Boca Medical from 2015 through the present.

144. According to the Government Claims Data, the Subject Hospitals submitted and Medicare paid 3,320 fee-for-service inpatient claims for Internal Fixation Admissions from January 1, 2015 through December 31, 2024, on which Medicare paid $42,036,779.45, and submitted a further 2,092 Internal Fixation Admissions to Medicare Advantage organizations and 434 Internal Fixation Admissions to the Florida Medicaid Program and its managed care plans through June 30, 2025, on which the Subject Hospitals billed $386,488,656 and $116,228,736 in charges, respectively. Across all orthopedic trauma and reconstructive MS-DRGs, Medicare fee-for-service payments to the Subject Hospitals over the same period exceeded $76 million.

145. Each individual Medicare or Medicaid claim form submitted for any such procedure — whether on CMS Form 1500, CMS Form 1450 (UB-04), or any successor form — is a separate "claim" for purposes of 31 U.S.C. § 3729(b)(2) and is subject to a separate civil monetary penalty. Statutory civil penalties under the Federal FCA, as adjusted for inflation pursuant to 28 C.F.R. § 85.5, currently range from approximately $14,308 to $28,619 per false claim.

146. Based on the Government Claims Data alone, and applying the 80-20 Rule's eighty percent (80%) floor, the Medicare fee-for-service Internal Fixation Admissions at the Subject Hospitals give rise to no fewer than 2,656 false claims, carrying civil penalties of between approximately $38,002,048 and $76,012,064 before any consideration of trebled damages, and the Medicare Advantage and Florida Medicaid Internal Fixation Admissions add no fewer than 2,020 additional false claims.

147. After trebling actual damages and combining with statutory civil penalties, total exposure for the conduct alleged at the Subject Hospitals is conservatively estimated to exceed $150 million.

148. All such kickback-tainted payments are owed back to the Government. Medicare, Medicare Advantage organizations, the Florida Medicaid Program, and other Government Healthcare Programs have paid claims for medical devices and related medical procedures that were tainted by Defendants' knowing payment and receipt of kickbacks. As set forth above, Defendants have caused the payment of kickbacks, thus tainting reimbursement for all surgeries performed using Synthes products under the 80-20 Rule architecture, and for all reimbursement received from Government Healthcare Programs for those surgeries.

149. Relators have retained the services of the undersigned attorneys to prosecute this action on their behalf in their capacities as Relators, and they have agreed to pay them a reasonable fee and to reimburse all costs of prosecuting this action, contingent upon the success of such prosecution.

## COUNT I

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A) (False Claim for Payment)
### (Against All Defendants)

150. Relators repeat and reallege the allegations and statements contained in Paragraphs 1 through 149 as though fully set forth herein.

151. In pertinent part, the Federal FCA establishes liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

152. Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A). Delray Medical and West Boca Medical presented the false claims, each of which sought payment for an

inpatient admission or outpatient encounter at the Subject Hospitals in which a Synthes implant procured under the 80-20 Rule was used, to Medicare, to Medicare Advantage organizations, to the Florida Medicaid Program and its managed care plans, and to TRICARE from 2015 through the present, including the claims identified in Section IX above. Tenet caused those claims to be presented by negotiating and administering the 80-20 Rule on behalf of the Subject Hospitals, by furnishing the physician assistant services and enforcement bonuses through which the Subject Hospitals met the rebate threshold, and by directing the Subject Hospitals' exclusion of competing implant vendors. Synthes caused those claims to be presented by offering and paying the rebates that induced the Subject Hospitals to select and use Synthes implants, and by supplying, through its representatives in the Subject Hospitals' operating rooms, the implants that were substituted for the competing products surgeons had selected.

153. This is a claim for treble damages and statutory civil penalties under the Federal FCA, 31 U.S.C. § 3729 et seq., as amended.

154. Through the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims to officers, employees, or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

155. The United States was unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants. Compliance with the Anti-Kickback Statute is material to the Government's decision to pay the claims at issue: Congress has provided by statute that a claim including items resulting from a kickback is a false claim, 42 U.S.C. § 1320a-7b(g); CMS conditions hospital enrollment on the express acknowledgment that payment is conditioned on compliance with the Anti-Kickback Statute; every Medicare cost report certified by the Subject

Hospitals warns that services procured through a kickback expose the hospital to criminal, civil, and administrative sanctions; and the Government routinely declines to pay, recoups, and excludes providers from the Federal health care programs on the basis of kickback-tainted claims. The Government's general awareness that hospitals and device manufacturers use volume discounts that satisfy the Discount Safe Harbor is not knowledge that the Subject Hospitals were being paid market-share rebates coupled with free physician assistant services to surgeons and bonuses to hospital personnel for excluding competitors, none of which Defendants disclosed. The decision of the United States and the State of Florida not to intervene in this action is not a determination on the merits and is not an indication that either sovereign would have paid the claims with knowledge of the kickbacks. In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States paid and continues to pay claims that would not be paid if Defendants' unlawful conduct was known to the United States.

156. As a result of Defendants' acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

157. Additionally, the United States is entitled to a civil penalty per false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein, in the statutorily prescribed amount, as adjusted for inflation, for each such false claim.

## COUNT II

**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B) (False Statement)**
**(Against All Defendants)**

158. Relators repeat and reallege the allegations and statements contained in Paragraphs 1 through 149 as though fully set forth herein.

159. In pertinent part, the Federal FCA establishes liability for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

160. This is a claim for treble damages and civil penalties under the Federal FCA, 31 U.S.C. § 3729 et seq., as amended.

161. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

162. The records and statements were false in that they purported to show compliance with the Anti-Kickback Statute when in fact Defendants had paid and received illegal kickbacks structured as rebates, in-kind physician assistant services, and executive bonuses tied to enforcement of the 80-20 Rule. The false records and statements include (a) the Medicare enrollment applications (Form CMS-855A) executed by each Subject Hospital, in which each acknowledged that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with the Anti-Kickback Statute; (b) the annual Medicare cost reports (Form CMS-2552-10) certified by each Subject Hospital for fiscal years 2015 through 2024, each of which certified that the services identified in the cost report were provided in compliance with applicable laws and regulations and none of which reported the Synthes rebates as a reduction in the cost of the implants to which they related, as alleged in Paragraphs 53 through 56 above; and (c) each Form CMS-1450 (UB-04) claim, and its electronic equivalent, submitted by the Subject Hospitals for an Internal Fixation Admission in which a Synthes implant was used, each of which impliedly certified compliance with the Anti-Kickback Statute.

163. Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States. The statements were made knowingly because Defendants knew, or acted in deliberate ignorance or reckless disregard of whether, their kickback scheme violated the Anti-Kickback Statute, for the reasons set forth in Section X above.

164. The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants. The United States paid and continues to pay claims that would not be paid if Defendants' unlawful conduct was known.

165. By virtue of the false records or false claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the Federal FCA to be determined at trial. Additionally, the United States is entitled to civil penalties, as adjusted for inflation, for each false claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT III

**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C) (Conspiracy)**
**(Against All Defendants)**

166. Relators repeat and reallege the allegations and statements contained in Paragraphs 1 through 149 as though fully set forth herein.

167. In pertinent part, the Federal FCA establishes liability for "any person who . . . conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

168. This is a claim for civil penalties and treble damages under the Federal FCA, 31 U.S.C. § 3729 et seq., as amended.

169. Through the acts described above, Defendants conspired with one another to knowingly present or cause to be presented false claims to the United States and to knowingly make, use, or cause to be made or used false records and statements material to those claims. The agreement among the conspirators is the 80-20 Rule itself: the written agreements between Synthes and Tenet, on behalf of the Subject Hospitals, under which Synthes agreed to pay rebates conditioned on the Subject Hospitals' achievement of a Synthes market-share threshold, and Tenet and the Subject Hospitals agreed to achieve that threshold and to bill the resulting admissions to Medicare, to Medicare Advantage organizations, to the Florida Medicaid Program, and to TRICARE.

170. Defendants committed overt acts in furtherance of the conspiracy, including: Synthes' payment of year-end rebates to Tenet and the Subject Hospitals for each year from 2015 through the present; Phillips' 2015 directive that Stryker and Trident products be removed from Delray Medical; Delray Medical's provision of hospital-paid physician assistants to Dr. Buchalter and other surgeons who agreed to use Synthes implants; Tenet's payment of bonuses to Phillips and other Delray Medical personnel for enforcing the 80-20 Rule; Kesser's November 3, 2022 directive that CarboFix remove all trauma trays from West Boca Medical within twenty-four (24) hours; Cole's February 1, 2023 email barring Trident from both Subject Hospitals; Cole's March 13, 2023 denial of Dr. Palmer's request for Trident implants and her proposal that "the Synthes rep" substitute Synthes product; West Boca Medical's denials of Dr. Krantzow's requests to use CarboFix implants in late 2022 and early 2023; the April 17, 2023 meeting at which Cole, Kesser, Ramirez, and Gray enforced the arrangement; Galloway's May 16, 2023 demand that CarboFix remove its trays from Delray Medical; and the submission by the Subject Hospitals of each of the claims described in Section IX above.

171. As a result, the United States was unaware of the false claims submitted and caused to be submitted by Defendants, and the United States paid and continues to pay claims that would not be paid if Defendants' unlawful conduct was known to the United States.

172. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

173. By virtue of Defendants' conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the Federal FCA, to be determined at trial, plus civil penalties, as adjusted for inflation, for each violation.

## <u>COUNT IV</u>

**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G) (Retaining Overpayments)**
**(Against All Defendants)**

174. Relators repeat and reallege the allegations and statements contained in Paragraphs 1 through 149 as though fully set forth herein.

175. The Federal FCA also establishes liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The Federal FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

176. Defendants have knowingly caused and retained overpayments from Federal Healthcare Programs arising from their violations of the Anti-Kickback Statute addressed above. Under 42 U.S.C. § 1320a-7k(d), a person who has received an overpayment from Medicare or Medicaid must report and return it within sixty (60) days of the date on which it is identified, and

an overpayment retained after that deadline is an obligation within the meaning of 31 U.S.C. § 3729(b)(3). Tenet and the Subject Hospitals identified, or in reckless disregard failed to identify, the overpayments arising from the Internal Fixation Admissions no later than the date on which this action was unsealed and served upon them, and have not reported or returned them.

177. By virtue of Defendants causing and retaining overpayments from Medicare, Medicaid, TRICARE, and other Federal healthcare programs, the United States has sustained damages and is entitled to treble damages under the Federal FCA, to be determined at trial, plus civil penalties for each violation.

## <u>COUNT V</u>

**Florida False Claims Act**
**Fla. Stat. §§ 68.081 et seq.**
**(Against All Defendants)**

178. Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

179. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Florida agency, and to the Florida Medicaid managed care plans through which AHCA pays for hospital services, a false claim for payment or approval, in violation of Section 68.082(2)(a) of the Florida Statutes, including the claims for the 434 Internal Fixation Admissions billed by the Subject Hospitals to the Florida Medicaid Program and its managed care plans from January 1, 2015 through June 30, 2025 described in Paragraph 127 above.

180. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Florida agency, in violation of Section 68.082(2)(b) of the Florida Statutes.

181. By virtue of the acts described above, Defendants conspired to commit a violation of Section 68.082(2) of the Florida Statutes.

182. The State of Florida, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and conduct of Defendants as alleged herein.

183. By virtue of Defendants' acts, the State of Florida has sustained damages and therefore is entitled to treble damages under the Florida FCA, to be determined at trial, plus a civil penalty per violation as set forth under Florida law.

## PRAYER FOR RELIEF

**WHEREFORE,** Relators TODD GOBERVILLE, SIMON CASORIA, and RICHARD J. WALLACE, III, on behalf of the United States of America and the State of Florida, respectfully request that the Court enter judgment against Defendants, jointly and severally, as follows:

A. Awarding the United States the maximum damages permitted under the Federal False Claims Act, in an amount equal to three times the damages sustained by the United States, plus civil penalties of $14,308 to $28,619 (as adjusted for inflation) for each false claim;

B. Awarding the State of Florida the maximum damages permitted under the Florida False Claims Act, in an amount equal to three times the damages sustained by the State of Florida, plus civil penalties for each violation;

C. Awarding Relators the maximum amount allowed under the qui tam provisions of 31 U.S.C. § 3730(d) and Fla. Stat. § 68.085, including a Relators' share of between twenty-five percent (25%) and thirty percent (30%) of the proceeds of the action or settlement of the claim;

D. Awarding Relators their reasonable attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d) and Fla. Stat. § 68.086;

E. Awarding pre- and post-judgment interest at the maximum rate permitted by law; and

F. Granting such other and further legal and equitable relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs-Relators demand a trial by jury on all issues so triable.

Dated: October 16, 2026

Respectfully submitted,

**SEARCY DENNEY SCAROLA**
**BARNHART & SHIPLEY, P.A.**
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9451

*By: /s/ John Scarola*
**JOHN SCAROLA, ESQ.**
Florida Bar No.: 169440
mmccann@searcylaw.com
**JACK PATRICK HILL, ESQ.**
Florida Bar No.: 547808
jph@searcylaw.com

**DI PIETRO PARTNERS, PLLC**
901 East Las Olas Boulevard, Suite 202
Fort Lauderdale, Florida 33301
Telephone: (954) 712-3070
Facsimile: (954) 337-3824
Primary Service Email: service@ddpalaw.com

*By: /s/ David Di Pietro*
**DAVID DI PIETRO, ESQ.**
Florida Bar No.: 10370
david@ddpalaw.com
**LISANDRA ESTEVEZ, ESQ.**
Florida Bar No.: 111475
lisandra@ddpalaw.com

**GINNIS, KRATHEN & ZELNICK, P.A.**
201 SE 12th Street, Suite 100
Fort Lauderdale, Florida 33316
Telephone: (954) 905-4600
Facsimile: (954) 905-4605

*By: /s/ Eric J. Ginnis*
**ERIC J. GINNIS, ESQ.**
Florida Bar No.: 627429
eg@gkzlegal.com

***Counsel for Plaintiffs-Relators***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 16, 2026, I electronically filed the foregoing document with the clerk of the Court using the CM/ECF system, which will serve a copy on all counsel of record.

*/s/ JACK P. HILL*
JACK P. HILL